COURT OF APPEALS









COURT
OF APPEALS

EIGHTH
DISTRICT OF TEXAS

EL
PASO, TEXAS

 

COOPER TIRE & RUBBER
COMPANY,           )

                                                                              )

Appellant,                          )

                                                                              )

v.                                                                           )

                                                                              )

OSCAR MENDEZ, JR.,
Individually and as           )              
No.  08-01-00340-CV

Administrator of the Estate
of MARIA LUISA       )

MENDEZ, Deceased, and as
Next Friend of          )                   Appeal from the

LAURA MARIA MENDEZ and
DANIEL            )

MENDEZ, Minor Children,
OSCAR                     )            
County Court at Law #5

MENDEZ, SR., CARLOS DURAN,
RUBEN       )

DURAN, GUILLERMO DURAN,
CYNTHIA     )            of El Paso County,
Texas

RECODER, Individually and as
Administratrix        )

of the Estate of ADELA
DURAN, Deceased,        )                    (TC# 97-4119)

MELISSA DENISE SNYDER,
Individually           )

and as Administratrix of the
Estate of MANUEL     )

DURAN, Deceased, and
GUILLERMINA            )

DURAN, Individually and as
Next Friend of           )

KEVIN SCOTT DURAN, A Minor
Child,            )

                                                                              )

Appellees.                          )

 

 

O P I N I O N

 








This manufacturing
defect case arises from a tragic single-vehicle accident, which resulted in the
deaths of four occupants and serious injuries to three other occupants.  Appellees, the surviving driver and occupants
and estate administrators of the decedents (collectively, Athe Plaintiffs@)
sued Appellant Cooper Tire & Rubber Company (ACooper
Tire@), asserting
that a tire on the vehicle failed due to a manufacturing defect that caused the
tire=s belt
separation.  The jury found in favor of
the Plaintiffs and the trial court rendered judgment on the verdict against
Cooper Tire in the total amount of $11,508,080. 
On appeal, Cooper Tire brings ten issues, with various sub-issues, for
appellate review, including legal and factual sufficiency challenges to the
jury=s
findings, the admissibility of certain evidence and expert testimony, jury
charge error, improper jury argument, and jury misconduct.  We affirm the trial court=s judgment.  

BACKGROUND

On June 29, 1997,
a Sunday afternoon, Oscar Mendez, Sr. and his wife were traveling with Manuel
Duran and his relatives on a trip to Albuquerque, New Mexico in a Mazda
minivan.  The minivan belonged to Celia
Salas, one of the passengers.  At a rest
stop in Truth or Consequences, New Mexico, Mr. Mendez took over as the
driver.  When they were approximately
twenty miles from Albuquerque, the tread separated on the minivan=s left rear tire, a Sigma Grand Sport
Radial Tire manufactured by Cooper Tire. 
According to witnesses, the minivan was driving normally when all of a
sudden they observed a dirt clod (or what appeared to be dirt) fall from the
left rear tire.  Within seconds, the
minivan crossed into the right-hand lane and started to drive onto the shoulder
of the road.  It appeared to witnesses as
if the driver was trying to bring the minivan back onto the road when it
started to roll over.  Six of the seven
passengers in the minivan were ejected. 
One victim died at the scene and three other victims were pronounced
deceased upon arrival to the hospital.








In this lawsuit,
the Plaintiffs claimed the failed tire had a manufacturing defect that caused
the accident and the resulting deaths and injuries.  Cooper Tire denied there was a defect in the
tire and asserted a negligence claim against the driver, Mr. Mendez.  The jury found that there was a manufacturing
defect in the tire at the time it left Cooper Tire=s
possession and that it was a producing cause of the occupants= injuries.  The jury also found that Mr. Mendez was not
negligent in causing the accident and that there was clear and convincing
evidence that Melissa Snyder was the biological daughter of decedent Manuel
Duran.

MANUFACTURING
DEFECT

Jury
Charge:  Omission of AFlaw@ Element

In Issues Two and
Three, Cooper Tire contends the Plaintiffs failed to obtain a jury finding on
the Aflaw@ element of their manufacturing defect
claim and that the trial court=s
refusal to incorporate the Aflaw@ element is harmful error.

To recover in
strict liability for a manufacturing defect, the plaintiff must show that the
finished product was defective at the time the product left the seller and that
the defect was a producing cause of the plaintiff=s
injuries.  See Torrington Co. v.
Stutzman, 46 S.W.3d 829, 844 (Tex. 2000); American Tobacco Co., Inc. v.
Grinnell, 951 S.W.2d 420, 426 (Tex. 1997), quoting Restatement (Second) of Torts ' 402A (1965).  A product has a manufacturing defect if its
construction or quality deviates from the specifications or planned output in a
manner that renders it unreasonably dangerous. 
Torrington, 46 S.W.3d at 844; Grinnell, 951 S.W.2d at 434.

The trial court submitted the
following question on the Plaintiff=s
liability theory:

QUESTION 1

 

Was there a manufacturing defect in the
tire at the time it left the possession of Cooper Tire & Rubber Company
that was a producing cause of the injuries to Maria Luisa Mendez, Adela Duran,
Manuel Duran, and Oscar Mendez, Sr.?

 








A >defect=
means a condition of the product that renders it unreasonably dangerous.  An >unreasonably
dangerous= product
is one that is dangerous to an extent beyond that which would be contemplated
by the ordinary user of the product, with the ordinary knowledge common to the
community as to the product=s
characteristics.

 

Cooper Tire objected to the jury
question on the basis that it lacked a definition of manufacturing defect.[1]  Cooper Tire also filed with the court its
requested instruction to accompany Question 1.[2]

On appeal, Cooper
Tire argues that the Plaintiffs failed to meet their burden in proving and
obtaining a jury finding on each element of their cause of action.  In response, the Plaintiffs assert that there
is no such thing as a Aflaw
element@ separate
from the manufacturing defect itself.  We
agree.








Cooper Tire cites
to no authorities to support its claim that the Plaintiffs must prove a Aflaw@
element beyond obtaining a finding of a defect. 
Under Torrington and Grinnell, a plaintiff shows that a
product has a manufacturing defect through evidence that the finished product
deviates from the specifications or planned output in a manner that
renders it unreasonably dangerous.  See
Torrington, 46 S.W.3d at 844; Grinnell, 951 S.W.2d at 434.  We observe that Cooper Tire=s requested instruction is similar to a
definition of manufacturing defect that appears in a footnote in USX Corp.
v. Salinas, 818 S.W.2d 473, 482 n.8 (Tex.App.--San Antonio 1991, writ
denied).  The Salinas case
involved a marketing defect claim, but the court in dicta cited E. Carstarphen,
Product Defects, 2 Texas Torts
and Remedies '
41.01[2] (1991), for the proposition that A[a]
manufacturing defect exists when a product does not conform to the design
standards and blueprints of the manufacturer and the flaw makes the product
more dangerous and therefore unfit for its intended or reasonably foreseeable
uses.@  Salinas, 818 S.W.2d at 482 n.8.  The Salinas Court apparently provided
a more narrow definition of manufacturing defect than is recognized under
leading Texas case law.  We do not find
the Salinas definition controlling in this case.  We conclude no Aflaw@ element was omitted in the jury
question nor did the trial court err in refusing to incorporate Cooper Tire=s Aflaw@ instruction.  Issues Two and Three are overruled.

Sufficiency
of Evidence on Manufacturing Defect

In Issue One,
Cooper Tire challenges the legal and factual sufficiency of the evidence to
support the jury=s finding
of a manufacturing defect in the tire in question at the time it left Cooper
Tire=s
possession.  Within this issue, Cooper
Tire also contends the trial court erred in admitting expert testimony from
three of the Plaintiffs=
witnesses and erred in admitting a technical report from RAPRA Technology,
Ltd., and testimony from Richard Angell, a former Cooper Tire employee.

Standards
of Review








In reviewing a
legal sufficiency challenge where the complaining party on appeal did not bear
the burden of proof at trial, we analyze the issue as a Ano-evidence@ challenge.  Croucher v. Croucher, 660 S.W.2d 55,
58 (Tex. 1983).  In our review, we
consider the evidence in a light that tends to support the jury=s finding and disregard all evidence
and inferences to the contrary.  Southwest
Key Program, Inc. v. Gil-Perez, 81 S.W.3d 269, 274 (Tex. 2002).  If there is more than a scintilla of evidence
to support the finding, the legal insufficiency challenge fails.  Formosa Plastics Corp. USA v. Presidio Eng=rs & Contractors, Inc., 960
S.W.2d 41, 48 (Tex. 1998).  We will
sustain a no-evidence challenge when: 
(1) the record discloses a complete absence of evidence of a vital fact;
(2) the court is barred by rules of law or of evidence from giving weight to
the only evidence offered to prove a vital fact; (3) the evidence offered to
prove a vital fact is no more than a mere scintilla; or (4) the evidence
establishes conclusively the opposite of the vital fact.  Marathon Corp. v. Pitzner, 106 S.W.3d
724, 727 (Tex. 2003).  The evidence is no
more than a scintilla A[w]hen
the evidence offered to prove a vital fact is so weak as to do no more than create
a mere surmise or suspicion of its existence . . . .@  Kindred v. Con/Chem, Inc., 650 S.W.2d
61, 63 (Tex. 1983).  More than a
scintilla exists when the evidence Arises
to a level that would enable reasonable and fair-minded people to differ in
their conclusions.@  Transp. Ins. Co. v. Moriel, 879 S.W.2d
10, 25 (Tex. 1994). 

In reviewing a
challenge to the factual sufficiency of the evidence, we consider all the
evidence both supporting and contradicting the jury=s
finding.  Cain v. Bain, 709 S.W.2d
175, 176 (Tex. 1986).  We will set aside
the judgment only if it is so contrary to the overwhelming weight of the
evidence as to be clearly wrong and manifestly unjust.  Id. 
It is not within the province of the reviewing court to interfere with
the jury=s
resolution of conflicts in the evidence, or to pass on the weight or
credibility of the witnesses=
testimony.  Campbell v. Salazar,
960 S.W.2d 719, 724 (Tex.App.--El Paso 1997, pet. denied).  Where there is conflicting evidence, the jury=s verdict on the matter is generally
regarded as conclusive.  Id.








We review
evidentiary rulings under the abuse of discretion standard.  Owens‑Corning Fiberglas Corp. v. Malone,
972 S.W.2d 35, 43 (Tex. 1998).  A trial
court abuses its discretion when it acts without regard for any guiding rules
or principles.  Downer v. Aquamarine
Operators, Inc., 701 S.W.2d 238, 241‑42 (Tex. 1985).  Unless the trial court=s
erroneous evidentiary ruling probably caused the rendition of an improper
judgment, we will not reverse the ruling. 
See Tex.R.App.P.
44.1; Owens‑Corning, 972 S.W.2d at 43. 

Expert
Witness Testimony

We first address
Cooper Tire=s
complaints concerning the qualifications and reliability of Plaintiffs= three expert witnesses:  Richard ARex@ Grogan, Dr. Alan Milner, and Jon
Crate.  Cooper Tires argues that the
trial court erred in admitting this expert testimony, and therefore, this Court
cannot consider that testimony in conducting our evidentiary review.  See Merrell Dow Pharms., Inc. v. Havner,
953 S.W.2d 706, 711 (Tex. 1997).

Texas Rule of
Evidence 702 provides:  AIf scientific, technical, or other
specialized knowledge will assist the trier of fact to understand the evidence
or to determine a fact in issue, a witness qualified as an expert by knowledge,
skill, experience, training, or education may testify thereto in the form of an
opinion or otherwise.@  Tex.R.Evid.
702.  The party offering the expert=s testimony bears the burden to prove
that the witness is qualified under Rule 702. 
See Gammill v. Jack Williams Chevrolet, Inc., 972 S.W.2d 713, 718
(Tex. 1998).  Whether a witness is
qualified as an expert is within the trial court=s
discretion.  E.I. du Pont de Nemours
& Co., Inc. v. Robinson, 923 S.W.2d 549, 558 (Tex. 1995).








Rule 702 also
requires that an expert=s
testimony be relevant and based on a reliable foundation.  See Robinson, 923 S.W.2d at 556.  In Robinson, the Texas Supreme Court
identified six non-exclusive factors to consider in determining whether
scientific evidence is reliable, and thus, admissible under Rule 702.  Id. at 557.  These Robinson factors are:  (1) the extent to which the theory has been
or can be tested; (2) the extent to which the technique relies upon the
subjective interpretation of the expert; (3) whether the theory has been
subjected to peer review and/or publication; (4) the technique=s potential rate of error; (5) whether
the underlying theory or technique has been generally accepted as valid by the
relevant scientific community; and (6) the non‑judicial uses which have
been made of the theory or technique.  Robinson,
923 S.W.2d at 557.  The Robinson factors,
however, do not always apply to experts who testify on the basis of specialized
knowledge.  See Gammill, 972
S.W.2d at 726.  AExperience
alone may provide a sufficient basis for an expert=s
testimony in some cases, but it cannot do so in every case.@ 
Id.  While expert testimony
must still be proven reliable pursuant to Rule 702, in such cases, the court in
conducting its gatekeeper analysis Amay
conclude that there is simply too great an analytical gap between the data and
the opinion proffered.@  Id. 
Nevertheless, Rule 702 demands that the court Aevaluate
the methods, analysis, and principles relied upon in reaching the opinion . . .
[in order to] ensure that the opinion comports with applicable professional
standards outside the courtroom and that it >will
have a reliable basis in the knowledge and experience of [the] discipline.=@  Gimmill, 972 S.W.2d at 725‑26; see
also Tex.R.Evid. 702.  The trial court=s
duty is not to determine whether the expert=s
conclusions are correct, but rather whether the analysis used to reach them is
reliable.  Gammill, 972 S.W.2d at
728.

Richard
ARex@ Grogan=s
Testimony








Richard ARex@
Grogan is a tire failure analyst.  In
1947, Mr. Grogan joined Dunlop Tire Company in Birmingham, England and worked
in its technical department, the compounds laboratory.  Mr. Grogan became a compounder and was
engaged in developing new rubber compounds for all aspects of tires and inner
tubes.[3]  Around 1960, Mr. Grogan was transferred to
the tire examination laboratory where he later served as Acting Manager.[4]  During that time, Mr. Grogan and the
manager established the x-ray department, which became their
responsibility.  Mr. Grogan then served
as Deputy Manager in the tire textile laboratory for about a year before being
appointed in 1964 to take over the technical service section, a department of
five tire examiners whose function was to examine returned tires and alert the
technical department about possible future service defects.[5]  In this position, Mr. Grogan represented the
company in legal matters as an expert witness and organized and ran training
courses for police and forensic scientists on behalf of the British government.








Around 1967, Mr.
Grogan again took over management of Dunlop=s
tire examination laboratory and x-ray department, but retained his position in
the technical service section.[6]  Mr. Grogan left Dunlop in 1980 and
became an independent pneumatic tire consultant.  In 1982, Mr. Grogan developed a course in
forensic tire examination for the Institute of Police Technology Management in
Jacksonville, Florida, in conjunction with North Florida University and joined
their adjunct faculty.  In 1987, he
published a book entitled, AAn
Investigator=s Guide
to Tire Failures,@ which he
revised and expanded in 1999.[7]  Mr. Grogan has also written thirty to forty technical
articles on tire failure analysis in publications such as the Journal of the
Forensic Science Society and the Institute of Accident Investigator=s Journal.  Between 1984 and 1987, Mr. Grogan wrote a
monthly column in Tires and Accessories, one of the tire trade journals.

Mr. Grogan=s qualifications included specialized
knowledge and extensive experience in 
tire failure analysis and tire examination.  Based on the evidence before the trial court,
the Plaintiffs clearly met their burden in showing that Mr. Grogan was
qualified to be an expert on the specific issues in this case.  See Broders v. Heise, 924 S.W.2d 148,
152 (Tex. 1996)(trial court=s
role is to ensure that those who purport to be experts truly have expertise
concerning the actual subject about which they are offering an opinion).  Therefore, the trial court reasonably
concluded that Mr. Grogan possessed the requisite knowledge, experience, and
training to testify in this case.








Cooper Tire also
argues that Mr. Grogan=s
testimony should have been excluded because his opinions lacked a reliable
scientific or factual basis.  At trial, Mr.
Grogan commented on a videotape produced by Cooper Tire called, ADesign for Quality,@ to explain to the jury how a tire is
made.  Mr. Grogan explained that a tire
is constructed in layers.  A tire is
built out of unvulcanized rubber components. 
During the process, sheets of brass-plated steel cords and the rubber
form the belt material.  Mr. Grogan
explained that brass is the adhesive because the rubber will not adhere to
steel.  In the manufacturing process,
Cooper Tire used canvas as protective material to prevent the rubber sheets
from sticking to each other.  Once the
tire goes through the vulcanization process, or the cure, the rubber layers
bond and the various components lose their separate identity.

Mr. Grogan
testified that his method of conducting a tire examination begins with a visual
and tactile examination of the tire. 
Over the years, Mr. Grogan has produced a data sheet with various
sequential questions he uses in his investigation.  For example, Mr. Grogan=s queries concern information such as
the type of tire, its condition, features, the manufacturer, when it was
produced and where, and the tread pattern. 
Mr. Grogan also inspects the separated components and the wheel and
sidewall for any damage or bead grooving--which is damage to the rubber caused
by movement where the tire and wheel meet. 
He then visually inspects the inside of the tire.  At this stage, Mr. Grogan checks for damage,
evidence of repairs, signs of stress, and indicators that the tire was run
underinflated or deflated.  Mr. Grogan
also inspects the condition of the valve. 
After forming a preliminary opinion, Mr. Grogan inspects the tire a
second time several days later.[8]  Mr. Grogan employs directional lighting in
conducting his examination, takes many photographs, and frequently x-rays the
tire to view the steel inside the rubber. 
At times, Mr. Grogan utilizes various specialists, like an analytical
chemist, once he has formed his preliminary opinion.

 








After examining
the tire in this case, Mr. Grogan concluded that the tire failed by tread and
belt separation due to contamination of the skim stock.  In his inspection, Mr. Grogan found liner
marks or line impressions, which he opined were the cross-woven treads of the
canvas used to protect the rubber components from sticking to each other.  According to Mr. Grogan, the cross-woven
liner marks, could be nothing else but imprints from the canvas.  In reaching his conclusion about the cause of
the tread belt separation, Mr. Grogan considered a number of factors.  First, he observed looseness at the edge of
the belt, that is, all along one edge the steel is loose and is no longer
bonded to the tread and separated. 
Actual steel cord was exposed and the edges were coming out of place
with more and more extensive separation observable towards the failed area in
which a large chunk was loose.  Second,
he observed liner marking, which occurs between the interfaces or separate
components, indicating poor adhesion between the components.  Mr. Grogan concluded that the interface was
able to separate, which he opined should never occur.

Mr. Grogan
explained the significance of the liner marks in the underside of the tire
tread.  During vulcanization, the
separate components of a tire fuse to form one structure.  All the separate components should lose their
identity, but if interfaces are observable, it indicates that the tire has
separated along the lines where the components went into the mold, which should
never occur if the material is in proper condition to make a tire.  Mr. Grogan further stated that observing
liner marks means the tire came unglued and never properly fused.  Mr. Grogan opined that if a manufacturer
allows that to happen, it has produced an area of weakness in the tire, which
can cause the tire to separate, and is a very dangerous condition.

 








Mr. Grogan also
believed that from a manufacturing standpoint, a contaminant was the source of
the problem in this particular tire.  His
opinion was based on the fact that the tire had come apart at an interface between
two components, indicating that something had interfered with the stickiness of
the two surfaces.  Mr. Grogan could not
identify the contaminant visually, so he sent the tire to RAPRA Technology, a
firm of rubber specialists in England, which tested areas of the tire per his instructions.  Mr. Grogan stated that RAPRA has a worldwide
reputation and is widely used, that he knew they had absolutely the highest
competence, and that RAPRA produced this kind of information for experts such
as himself.  RAPRA=s
technical report identified a hydrocarbon wax in the tested areas.  Mr. Grogan knew from his experience as a
compounder that there should be no waxes in the compounding of the rubbers for
the stock in making the ply layers.  Mr.
Grogan explained that compounds that cover steel wires are commonly called skim
stock, as they skim over the top of the wires. 
He stated that this is the most sensitive compound in the tire because
it has to bond to steel and bond to itself and is where all the road stresses
are first encountered.








According to Mr.
Grogan, adhesion is absolutely critical in that compound area and softeners,
oil, or waxes are not put in there. 
Hydrocarbon waxes or oils, however, are appropriate for the sidewall or
the tread in order to prevent deterioration or cracking caused by ozone in the
air.  Mr. Grogan explained that when he
was a compounder he was familiar with microcrystalline waxes and stated that
such waxes move very little and can bleed through the compound and restore the
surface as protection.  These waxes
always move to an outside surface and do not migrate to the inside surface
between the two belt plies because of internal pressure that prevents the wax
from going in that direction.[9]  Based on his review of depositions and
affidavits in this case, in particular statements by Jean Hoffman, Cooper=s chief chemist, and Richard Angell, a
former bias cut operator, Mr. Grogan formed an opinion that the belt-belt
separation was a result of wax contamination in the factory.

In conducting the
tire examination, Mr. Grogan made an investigation which eliminated other
causation for the tire failure, including impact damage or a nail hole.  Mr. Grogan explained that nail puncture is a
very common reason for a tire to fail. 
Using a microscope, Mr. Grogan had observed an imprint of the head
of a nail hole in the rubber.  In his
opinion, the nail hole had no significance at all to the failure.  He formed this opinion based on observing no
signs of distress where the sidewall and rigid area underneath the tread, the
thinnest part of a tire and where a tire collapses when it goes flat.  He also observed that the tire was a tubeless
tire, whose innerliner sealed the nail in the tire very effectively because of
compression forces.  Based on his
examination, he determined that certain damage marks on the tread indicated
that the nail came loose from the tread when it began to separate.  In his experience, nails do not cause tread
separations.








Mr. Grogan also
determined that the tire had not been run flat, soft, or underinflated.  He based his opinion on the following
observations:  (1) there was no removal
of paint from inside of the tire, which starts to break away when there is a
lot of flexing in the area where the tread and sidewall meet; (2) there were no
signs of rubber wrinkling or chafing in that area, which would be caused by the
cords beginning to pull through the rubber; (3) there was no sign of bead
grooving, a line of quickly forming damage where the flange of the wheel
contacts the tire and there is movement between the two, which indicated that
the tire did not run flat or even soft; (4) measurements of tread depth
indicated the tire tread was a little bit more than half worn, but was a
perfectly usable tire in terms of tread depth; (5) there was no sign of
polishing from the rim; (6) no markings to indicate that the user had run the
tire at low pressures; (7) there were no broken cords, which would have
indicated structural impact that weakened the tire; and (8) there was no rust
on the tire and it had not been used beyond its legal limit.  Mr. Grogan also ruled out overloading of the
tire because he observed no sign of bead grooving whatsoever in the tire and no
signs of stress inside.








On appeal, Cooper
Tire argues that Mr. Grogan=s
opinions lacked a reliable scientific or factual basis.  Specifically, Cooper Tire argues that his
opinion on the role wax played in the belt separation had no scientific
foundation because he did no testing to determine if wax on the surface of belt
skim stock affected adhesion after vulcanization and did no testing to reveal
the effect, if any, wax has on belt adhesion. 
Further, Cooper Tire asserts that Mr. Grogan=s
opinions on liner marks have not been validated by testing and are entirely
subjective.  Cooper Tire claims Mr.
Grogan failed to provide a scientific basis for eliminating the puncture as a
cause of the separation.  Cooper Tire
also contends that the RAPRA report upon which Mr. Grogan based his opinion was
inadmissible as was Mr. Angell=s
testimony concerning wax and that neither support his opinions.

After reviewing
Mr. Grogan=s
testimony, we find that his opinions were reliable pursuant to Rule 702.  Mr. Grogan provided thorough information
concerning his methodology and it is clear that his expertise rested on his
many years of experience in tire examination for Dunlop and as an independent
tire failure analyst.  His preliminary
opinion was based on his observations and analysis of the tire itself and he
determined that the belt separation was caused by poor adhesion between the
rubber component layers.  Upon further
investigation, Mr. Grogan had his conclusion confirmed by the RAPRA report,
which identified the presence of wax in tested areas of the tire.

Cooper Tire
asserts that the RAPRA report was inadmissible hearsay and objected to its
admission into evidence because it could not be authenticated and was
hearsay.  However, experts may testify on
the basis of facts or data that need not be admissible in evidence if they are Aof a type reasonably relied upon by
experts in the particular field in forming opinion or inferences upon the
subject . . . .@  See Tex.R.Evid.
703; see also Tex.R.Evid.
705 (expert may disclose underlying facts or data on direct examination).  Here, Mr. Grogan testified that RAPRA was a
firm of rubber specialists and chemists who used sophisticated techniques, were
highly competent, and widely used by experts. 
He relied on their technical report to confirm his opinion concerning
lack of adhesion during manufacturing of the tire.








Cooper Tire also
asserts that Mr. Grogan=s
opinions lack a factual basis because he relied on deposition testimony from
Mr. Angell, which should have been excluded. 
Mr. Angell, a former Cooper Tire employee, testified that when he worked
as a bias cutter at Cooper Tire, he used a substance that felt, looked, and
acted like wax during the tire-making process. 
In his deposition testimony, Mr. Angell stated that excessive waxes were
put on the metal splices of the bias cutters to prevent jams, but wax would
appear on the bottom side of the cord plies. 
Mr. Angell believed that the substance was paraffin-based wax.  The waxes were used on the blade, on the
foot, on the conveyor belts, on the rollers, and on the splicing table or the
slide table.  Mr. Angell repeatedly
referred to the substance as wax, but the following exchange suggests his
testimony may have been inconsistent:

Q.        And when we are talking about wax, what
we are really talking about is white-inside-of-a-Dixie-cup looking things, aren=t we?

 

A.        Yes, sir.

 

Q.        That were made out there in the cement
house?

 

A.        Yes, sir.

 

Q.        Stearic acid?

 

A.        I have seen it all colors, yes sir.  I guess it is stearic acid.  I don=t
know what stearic acid is.

 

Q.        Okay. 
You don=t know
what it was exactly?

 

A.        No, sir.

 

Q.        It is just something that the--you were
given to work with?

 

A.        Yes, sir.  It looks--feels like wax, looks like wax,
acts like wax, and they call it wax.

 

Q.        Who calls its wax?

 

A.        That=s
the word the first time I was ever handed some.

 








Mr. Grogan had
also read deposition testimony by Ms. Hoffman. 
He recalled that she stated that waxes were applied to the making drum,
the guillotine blade that cuts the belt material, and the guidance
rollers.  In his opinion, Mr. Angell=s testimony simply confirmed what Ms.
Hoffman said about use of wax on the blade and the guidance rollers.  On direct examination, Ms. Hoffman testified
that the Cooper Tire plant receives stearic acid from a vendor, which is melted
down and put into paper cups.  She stated
that in 1994, stearic acid, not wax, was used to lubricate the machines, but a
lot of people in the plant called it wax. 
Ms. Hoffman also stated that wax would not have been used on the
bias cutters because it is not a very good lubricant.  Mr. Angell and Ms. Hoffman offered conflicting
testimony, which turned on witness credibility and evaluation of the weight of
the evidence.  We conclude the trial
court did not err in admitting Mr. Angell=s
testimony and note that Mr. Grogan did not rely solely on Mr. Angell=s testimony as the factual basis for
his conclusions.  Further, we conclude
the trial court reasonably found Mr. Grogan=s
testimony to have a reliable basis and overrule Cooper Tire=s challenge to this witness.

Dr.
Alan Milner=s
Testimony

Next, Cooper Tire
argues that the trial court erred in admitting expert testimony from
Dr. Alan Milner.  Cooper Tire
asserts that Dr. Milner was not qualified to testify about manufacturing
defects in tires, the effect of punctures on tires, or tire failure and his
opinions lacked a reliable, scientific, or factual basis.  We disagree.








Dr. Milner is a
professional engineer who has specialized since 1974 in failure analysis and
accident investigation involving metallurgical, mechanical, automotive, and
combustion engineering.  Dr. Milner was
educated in the United Kingdom and received his bachelor=s
degree in metallurgical engineering, which is now called material science, from
the University of Sheffield.  Metallurgical engineering includes the study
of failure analysis and is concerned with the application of the principles of
physics, mathematics, mechanical engineering, thermodynamics, and chemistry to
the manufacture of metals into forms and products and the evaluation and
testing of such products and structures. 
After receiving his bachelor=s
degree, Dr. Milner was employed by a large aircraft manufacturing company
in an apprenticeship in different areas of aircraft manufacturing.  He then worked at General Electric Company in
the nuclear power industry, where he conducted predictive failure analysis
involving steel structures, pressure vessels, and structures used in nuclear energy
and electric generating plants.  At the
same time, Dr. Milner attended the University of London and was awarded a
master of science degree in engineering.

In 1964, Dr.
Milner received his Ph.D. in metallurgy and materials from the University of
Manchester and was also a research associate during his studies there.  The subject of his dissertation involved the
bonding of materials and combining the properties of metals and metals in a
single material that would have special properties.  From 1964 to 1970, Dr. Milner worked for
Minnesota Mining and Manufacturing Company (A3M
Company@) on
federal defense research contracts involving the fabrication of metals,
troubleshooting, and failure analysis. 
In 1970, Dr. Milner became an Associate Professor of Metallurgical
Engineering at the University of Arizona.








He started his
engineering consulting business in 1974, which consists in product failure
analysis.  In particular, Dr. Milner
conducts non-destructive testing, x-ray examination, and microscopy--techniques
used in failure analysis to evaluate why products fail.  Dr. Milner is a licensed professional
engineer and is a member of various organizations, including the American
Society for Metals, the Society of Automotive Engineers, and the Systems Safety
Society.  He is also a member of Wire
Association International in connection with his work on steel cords that are
used as structural materials in tires.

Dr. Milner
testified that he has been doing failure analysis on tires for over twenty-six
years.  He explained that tires represent
composite materials, combinations of steel and other materials such as tire
rubber, and involve technologies which are based in materials science.  Dr. Milner stated that tire technology
is based on metallurgy, the chemistry of metals and metal rubber systems.  As a result, he has done a great deal of work
on the failure of tire beads, steel wired structures that retain the tire on to
the wheel, and tread separations in steel belt radial tires.  Dr. Milner explained that steel belt
structures, which are composites of steel wire, have metallurgical technologies
involved in them such as electroplating and diffusion processes, which are used
to bond them together.

Cooper Tire=s complaints are primarily directed at
Dr. Milner=s lack of
a formal education in tire design or manufacture and his lack of real world
experience with building a tire or performing tire testing for a federal
agency.  Cooper Tire also asserts that
Dr. Milner=s
research work and experience had nothing to do with tires or rubber.  After reviewing Dr. Milner=s testimony and evidence of his
qualifications, it is clear that Dr. Milner=s
education, training, and experience qualified him to render opinions in tire
failure analysis, a subject within his area of specialized knowledge. 








Cooper Tire also
challenges the reliability of Dr. Milner=s
opinions.  At trial, Dr. Milner explained
his methodology in conducting a failure analysis.  When conducting an tire examination for
forensic science purposes, it is generally accepted that the examination must
be nondestructive.  First, Dr. Milner
tries to obtain as many pieces of the failed tire as are available.  He then starts nondestructive testing by
identifying the type of product and the manufacturer.  If there are fragments, as was the case with
this particular tire, Dr. Milner examines the pieces to determine whether they
are, in fact, from the tire.  Dr. Milner
then fits the fragments together and indexes the pieces of the transferences
with the body or carcass of the tire. 
Dr. Milner stated that there are certain characteristic failure modes,
that is, ways in which the product fails that are characteristic of the
product.  In steel-belted radial tires,
there are two characteristic modes of failure: 
(1) belt-belt separation or tread separation, which usually starts at
the edges of the steel belts and progresses circumferentially and across the
tire, culminating in the tread coming off due to centrifugal force; and (2) the
possibility that the tire may have been underinflated during operation, in
which case the sidewall will fail, rather than the tire tread coming off.  If it were a case of sidewall failure, Dr.
Milner would not pursue the matter further because the reasons for the failure
are generally outside the scope of the manufacturer=s
responsibility.








Dr. Milner=s protocol started with an examination
of the pneumatic sealing condition of the tire. 
Dr. Milner examines the pressure vessel for indications that it has lost
air during its service life or has become damaged as a result of
underinflation.  In determining air
retention, Dr. Milner considers the presence of punctures and examines the beads
of the tire, which in a tubeless tire constitute the seal between the wheel and
the tire, to see the beads have been compromised or damaged.  Dr. Milner then examines the innerliner of
the tubeless tire, the sealing membrane on the interior surface of the
tire.  In particular, he checks for any
discontinuity or damage in the interior sealing surface.  Dr. Milner also looks for evidence of
underinflation in the past by examining for damage, or polish, where the lower
sidewall of the tire and the wheel flange come into contact.

After examining
the sealing aspects of the tire, Dr. Milner next conducted a visual inspection
of the fracture surface where the tread and steel belt separated from the
inner.[10]  In this case, his inspection revealed that
the separation was predominately between the inner and outer steel belts.  He observed extensive belt edge separation
around the circumference of the tire shoulders on both sides.  The fracture structure indicated that a large
section had peeled off in a single revolution while there were some marks that
suggested another section came off after successive turns and had the greatest
difficulty separating.  Specifically, Dr.
Milner testified that there were a number of fracture lines at the end of the
tread fragment that represent successive turn revolutions of the wheel as the
tread was peeling off.  However, in the
extended area, there were none of the marks that represent tire wheel
rotation.  Therefore, he concluded that
the extended area came off in a single revolution.  The puncture wound in the tire was in the
same general area as the section that had the greatest difficulty separating.








In photograph
enlargements of the separation surface, Dr. Milner observed fracture lines, or
cracking marks, in the immediate vicinity of the puncture, which indicated that
there was nothing in that area that represented an initiation of the
crack.  Other areas on the surface were
smooth due to treading against the tire carcass, but in the puncture area, the
cracking marks were sharp and unpolished, which indicated the separation
surface was the result of tearing rather than the result of tire damage
associated with the puncture.  Dr. Milner
concluded that the fracture that caused the tire to separate did not initiate
in the puncture location because the area was characterized by tearing around
it and not a polished surface, which indicates a growing separation that rubs
against the other part of the carcass.

Beyond his visual
inspection of the tire, Dr. Milner did some further nondestructive testing on
the tread fragment and did an x-ray examination of the full circumference of
the tire carcass.  He explained that the
purpose of taking an x-ray of the tire was to inspect the arrangement of fine
steel cables embedded in the rubber to see if there are any irregularities in
the steel belt structure or damage to it. 
Dr. Milner observed a very small entry hole on the tread, which was
characteristic of a nail.  It was
associated with some disruption of the tread, with damage to one steel cord and
a slight perforation in the innerliner, but Dr. Milner believed the damage was
very localized.  Dr. Milner further
examined the nail hole in the belts through micro lens photography.  The photographs showed damage caused by a
penetrating object, indicated that the object was small in diameter, and that
there was no deviation between the parallel lines of the steel wire=s normal position.  In sum, Dr. Milner saw very little distortion
due to the very small penetrating object.








Dr. Milner also
considered how well this tubeless tire sealed the puncture as it is designed to
do.  He saw no evidence that the nail
caused defamation in the permanent bending in the cord structure.  Dr. Milner also inspected the wires with a
microscope and observed no polishing, which would have indicated that the nail
was wiggling about and as a result burnishing the wires with which it came into
contact.[11]  In Dr. Milner=s
opinion, the nail had nothing to do with the belt tread separating.

Based on his x-ray
work, microscopic examinations, and physical inspection of the tire, Dr. Milner
also concluded that the tire had not been operated in an underinflated
condition.  He found no evidence to
suggest underinflation during his visual inspection of the sealing
surfaces.  The sealing characteristics of
the beads were normal, were all in very good condition and there was no fabric
exposed, which is significant to their inability to seal.  The innerliner was not irregular, except for
the small puncture hole.  Dr. Milner also
observed no exaggerated marks in the contact line between the rim flange and
the bead area, which would have indicated the tire was run overdeflected in an
underinflated manner.  He did observe
very light polish and no real groove, which meant very light use of the tires.








Based on his
examinations, Dr. Milner concluded that the tire developed belt edge separation
early in its life and that the separation began at the cut edges of the steel
belts and progressed circumferentially around both shoulders of the tire, which
was evidenced by polishing.  Dr. Milner
stated that the separation extended further than one would expect Aas a result of poor adhesion that
existed between the inner and outer steel belt.@  By examining the fracture surface, the
surface of separation, Dr. Milner ascertained the characteristics of the manner
in which it separated.  He determined
that it separated very readily which according to Dr. Milner is a
characteristic of poor adhesion.  Dr.
Milner explained to the jury that centrifugal force tends to throw the belt
off, but it is retained by its adhesion to the other belt.  In this case, as the separation of the belt
edges progressed, it reached the point where it could peel off readily.  The surface indicated to Dr. Milner that there
were extended areas of it which were never bonded initially when it was made
and the tread separated at those areas.  

On appeal, Cooper
Tire argues that Dr. Milner=s
opinions lacked a reliable foundation because he alleged an adhesion defect in
the tire caused the separation, but never obtained rubber samples and did not
conduct any adhesion testing.  After
reviewing Dr. Milner=s
testimony, we conclude that the trial court did not err in finding Dr. Milner=s opinions to be based on a reliable
foundation.  Dr. Milner provided great
detail concerning his methodology and procedure in tire examination.  He also applied his experiential knowledge in
failure analysis in determining the cause of the tread separation and in eliminating
other potential causes. 

Jon
Crate=s
Testimony

Cooper Tire also
challenges the admissibility of expert testimony from Jon Crate. Specifically,
Cooper Tire asserts that Mr. Crate was not qualified to testify as an expert in
this case.  Since Mr. Crate has not performed
tire failure analysis outside the litigation process, is not a expert in tire
design, tire manufacturing, or forensic tire examination, Cooper Tire asserts
he was unqualified to render his opinions, which lacked scientific and
objective support.  








Mr. Crate is a
researcher at the Georgia Tech Research Institute.  He holds a bachelor=s
degree in chemistry and a master=s
degree in polymer science and engineering. 
Mr. Crate spent two or so years working towards a Ph.D. in molecular
cell biology, but did not receive that degree. 
He then spent two years doing research in molecular biology and
biochemistry at the University of Alabama in Birmingham.  In 1991, Mr. Crate was an analytical chemist
for Applied Technical Services for seven and half years.  His field of specialty is chemical analysis
of polymers and foreign substances and failure analysis of polymers.  Polymers as a group include all plastics,
rubbers, coatings, paints, and composite made between different materials.  For the past ten years, Mr. Crate has been
doing chemical analysis of polymers, identification of foreign substances, and
failure analysis of products made out of plastic and rubber composites.

In this case, he
was retained for the purpose of interpreting the RAPRA report results.  Mr. Crate stated that RAPRA conducted two
types of chemical tests, infrared spectroscopy and gas chromatography/mass
spectroscopy.  Since 1991, Mr. Crate has
done such testing and interpreting of the results of testing on a weekly
basis.  In connection with his work at
Georgia Tech, he has used three different infrared spectrometers to perform
such tests.  In the last two years, Mr.
Crate has interpreted these types of tests and done analysis on seven
tires.  Mr. Crate did not consider
himself an expert in tire design, tire manufacturing, or forensic tire
examination.  He is not a professional
licensed engineer and has not published anywhere.

In this case, Mr.
Crate reviewed a copy of the RAPRA report, in particular the spectra presented
as part of the report.  Mr. Crate
examined the spectra and compared it with known standard spectra from standard
reference materials.  Mr. Crate reached
several conclusions as a result of his analysis of the data.  Mr. Crate stated that RAPRA report concluded
that the infrared spectra and the GC/MS data indicated the presence of paraffin
wax in tested areas and he agreed with that conclusion.  Mr. Crate explained that paraffin wax has
identifying characteristics and the two techniques used by RAPRA were
appropriate for identifying that chemical. 









The report also
concluded that there was no evidence of stearic acid present.  In his analysis, Mr. Crate obtained infrared
spectra for paraffin wax and stearic acid. 
Based on his review of Jean Hoffman=s
testimony, Mr. Crate knew that she claimed they did not use paraffin wax to
lubricate machinery as Mr. Angell had indicated in his deposition
testimony.  Rather, she claimed the plant
used stearic acid.  The eight infrared
spectra in the RAPRA report taken from samples of the underside of the belt
that separated showed zero indication of stearic acid.

Mr. Crate examined
RAPRA=s
infrared spectra and  noticed that they
found wax on the outer surface, but none on the cut face, that is, the bottom
side of the tire tread.  For Mr. Crate,
the significance of this finding was that wax is incorporated into some tire
components, but not others, and it is important in protecting the tread and
sidewall against oxidation, UV degradation, and ozone degradation.  Mr. Crate knew that wax was a component based
on recipes he has seen in the Vanderbilt Handbook, the Rubber Formulary, and deposition
testimony from Jerry Leyden, who confirmed that wax is used in the tread stock,
in the sidewall, but not in the belt stock. 
In all the recipes, Mr. Crate has seen the wax found on the fracture
site of this particular tire was not a part of the belt stock recipe.  Mr. Crate opined that wax inhibits the
adhesion to the steel.  

Mr. Crate was also
aware of the contention that this particular wax migrated or moved from the
tread and sidewalls in between the two belts. 
Mr. Crate agreed that wax, in fact, can migrate and that there are
forces especially in a new tire that cause it to bloom to the surface.  After reviewing four research articles,
including AQuantitative
Patterns of Blooming of 








Ozone-Protective Waxes in Tire
Vulcanisates@ and AMigration and Blooming of Waxes to the
Surface of Rubber Vulcanizates,@
Mr. Crate determined that it was not possible for the wax to bloom on the
surface.  From these studies, Mr. Crate
concluded that it is well-known that paraffin waxes are capable of migrating to
the surface by something called Ablooming.@ 
Mr. Crate also learned from the articles that:  (1) wax is readily soluble in rubber during
the hot mixing and curing processes; (2) waxes are insoluble or have very low solubility
in rubber at room temperature; (3) once rubber has cooled back down, it
crystallizes out and wax is not readily soluble in the rubber itself--this
insolubility is the driving force causing blooming; (4) the rate of blooming
over time drops off sharply once the wax is no longer supersaturated; (5) how
long it takes to reach that plateau depends on the temperature, the
concentration of wax, the type of rubber, the fillers used, the thickness of
the rubber, and the molecular weight of the wax; (6) some waxes have a higher
melting temperature and such waxes have a higher molecular weight; and (7) the
length of the straight chain hydrocarbons in the wax affects the rate of
migration and short chains will migrate quicker than long chains.

After reviewing
the testing done by RAPRA, deposition testimony, and the above factors, Mr.
Crate concluded that wax would not be expected on the fracture surface of the
belt skim stock.  Mr. Crate was convinced
that it came in during the manufacturing process, rather than coming from the
tire and through the skim stock.  Mr.
Crate had five bases for concluding that the wax was a foreign substance and
not part of the skim stock.  First, the
Vanderbilt Handbook and the Rubber Formulary all show waxes in tread stock, but
not in the belt skim stock.  Second,
deposition testimony confirmed that Cooper Tire and common industry practice is
not to include wax in belt skim stocks. 
Third, Mr. Angell=s
deposition testimony indicated that Cooper Tire used paraffin wax to lubricate
the bias cutters.  Fourth, RAPRA reported
data that wax was found on the fracture surface, but not on the cut faces and
that the molecular weight distribution was not changed between what is used in
the tread and what is found on the fracture surface.  Fifth, diffusion through a belt skim stock,
based on the research articles factors, would be limited by the solubility.








Having reviewed
Mr. Crate=s
testimony, we find that the trial court reasonably concluded that Mr. Crate was
qualified to render the opinions he made in this case.  Mr. Crate demonstrated that he had
specialized knowledge in chemical analysis, identification of polymer
materials, and was familiar with technologies used in related testing.  Mr. Crate explained his methodology in
analyzing data from the RAPRA report and the research materials that informed
his opinions in this case.

Sufficiency
of the Evidence

Viewing the
evidence in a light favorable to the verdict, we conclude that there is more
than a scintilla of evidence to support the jury=s
finding of a manufacturing defect.  After
reviewing all the evidence, we also conclude that the jury=s finding is not so contrary to the overwhelming
weight of the evidence as to be clearly wrong and manifestly unjust.  Issue One is overruled in its entirety.

CAUSATION

Sole
Causation Theory








In Issue Eight,
Cooper Tire argues the trial court committed reversible error by excluding
evidence of sole cause and by refusing to submit a sole cause instruction in
its charge to the jury.  At trial, Cooper
Tire sought to introduce evidence that the minivan had a greater propensity to
roll over because of the weight of the six passengers shifting to one side and
that if everyone had been belted, Mr. Mendez would have controlled the
vehicle.  Juan Herrera, an expert for
Cooper Tire, opined in a bill of exception that the passengers= unrestrained condition caused the
minivan=s trip
and roll.  Based on Mr. Herrera=s calculations, the van would not have
tripped and rolled if all seven occupants had been wearing seat belts.  Further, Mr. Herrera concluded that if the
minivan had not tripped and rolled, the ejected passengers would not have
sustained such serious injuries.  Cooper
Tire argues that this evidence was critical to its sole cause defense.[12]  However, we find that the trial court did not
abuse its discretion in its ruling and refusal to submit the requested jury
instruction because Cooper Tire=s
sole causation defense turned on evidence which at the time of trial was
inadmissible under the governing statute.

Each party is
entitled to submission of all of his theories if they have support in the
evidence.  Rankin v. Atwood Vacuum
Mach. Co., 831 S.W.2d 463, 465 (Tex.App.--Houston [14th Dist.]), writ
denied, per curiam, 841 S.W.2d 856 (Tex. 1992).  Sole proximate cause is an inferential
rebuttal issue, which may be included in the jury instructions at the trial
court=s
discretion.  Id. at 465; see
also Tex.R.Civ.P. 277.  Sole proximate cause applies to the conduct
of others not a party to the suit.  Rankin,
831 S.W.2d at 465; see also Montes v. Pendergrass, 61 S.W.3d 505, 508
(Tex.App.--San Antonio 2001, no pet.)(sole proximate cause application limited
to circumstances in which evidence shows that a third person=s conduct, not the conduct of any of
the parties to the lawsuit, is the sole proximate cause of the
occurrence).  In this case, Cooper Tire=s theory rested on the combined weight
of the unbelted occupants, but three of the six occupants not wearing seat
belts are parties to this suit. 
Therefore, the trial court did not err in refusing Cooper Tire=s instruction. 








Moreover, at the
time of trial, the Transportation Code provided that the A[u]se or nonuse of a safety belt is not
admissible evidence in a civil trial, other than a proceeding under Subtitle A
or B, Title 5, Family Code.@  Tex.Transp.Code
Ann. '
545.413(g)(Vernon 1999), repealed by Acts of 2003, 78th, R.S., ch. 204, ' 8.01, 2003 Tex.Gen.Laws 847, 863. 
In Carnation Co. v. Wong, the Texas Supreme Court held that the
plaintiffs Ashould
not have the damages awarded to them reduced or mitigated because of their
failure to wear available seat belts.@  Carnation Co. v. Wong, 516 S.W.2d 116,
117 (Tex. 1974)(per curiam).  In Pool
v. Ford Motor Co., the Court reaffirmed that holding and noted that the
legislature had simply ratified Carnation=s
policy for future cases.  Pool v. Ford
Motor Co., 715 S.W.2d 629, 633 (Tex. 1986)(discussing Tex.Rev.Civ.Stat. Ann. art. 6701d, ' 107C(j), former version of Section
545.413(g)); see also Bridgestone/Firestone, Inc. v. Glyn-Jones, 878
S.W.2d 132, 134 (Tex. 1994)(Subsection (j), in Section 107C was included to
make it clear that the sole legal sanction for the failure to wear a seat belt
is the criminal penalty provided by the statute and that the failure could not
be used against the injured person in a civil trial).  Based on the statute in effect at trial, we
conclude the trial court did not abuse its discretion in excluding Cooper Tire=s sole causation evidence.[13]  Issue Eight is overruled.  

Expert
Witnesses on Causation

In Issue Six,
Cooper Tire argues that the trial court erred in admitting expert testimony on
causation from Stephen Arndt and Curtis Flynn. 
We review this issue under the standard of review for admission of
expert testimony as previously set out in our discussion of Issue One.  

Stephen
Arndt=s
Testimony








Cooper Tire does
not challenge Stephen Arndt=s
qualification as an expert witness. Rather, Cooper Tire asserts that Mr. Arndt=s opinions were unreliable and lacked a
scientific or factual basis.  Mr. Arndt
has a background in engineering and owns a company that consults with the legal
community on automotive crash safety issues. 
In this case, Mr. Arndt investigated this particular accident and
inspected the accident vehicle and tire to understand how the tire tread
separation related to vehicle handling. 
In so doing, Mr. Arndt utilized testing he had done and relied on his
experience in his specialty field.  His
investigation involved reviewing materials such as the police report, police
photographs of the accident scene, the accident vehicle, the tire, reviewing
witness statements, and depositions of fact witnesses.

Mr. Arndt
inspected the accident vehicle with particular attention to the left rear wheel
position where the tire tread came off of the tire.  Based on his examination of the vehicle and
other documentation related to this case, Mr. Arndt concluded that physical
evidence on the vehicle showed that the initial tread separation interacted
with the wheel well and some of the structures within the vehicle.  Mr. Arndt opined that this interaction with
the wheel well caused a dragging and pulling of the vehicle to that side,
meaning the left rear separation pulled the vehicle to the left.  This conclusion corresponded to testing Mr.
Arndt has done in this area that demonstrated that a vehicle will initially pull
to the left.  Mr. Arndt also stated that
physical evidence on the roadway showed tire marking going from left to right.








Mr. Arndt believed
that a steer back to the right had to have occurred to redirect the vehicle in
that direction.  He explained that with
the tire tread gone from the vehicle at the left rear wheel position, the tire
did not have the same frictional capacities or cornering capacities as a tire
with tread.  Under these circumstances,
the vehicle behaves very differently; if one steers it to the right, it will
oversteer, which is a vehicle characteristic in this condition.  According to Mr. Arndt, in the first
event, there was not much steering input by the driver that caused the vehicle
to go to the right after it initially started to the left because the vehicle
would have spun out.[14]  The driver countersteered back to the left
and the vehicle came back in a counterclockwise rotation and then tripped and
rolled over.  After the driver steered
back to the left, he lost control of the vehicle since at that point all the
tires were saturated, meaning they lost their friction capability and were
sliding.  In Mr. Arndt=s opinion, the tread separation in the
left rear caused the accident in this case.








Mr. Arndt
explained to the jury his testing procedures and the evidence of tire tread
transfer markings on the vehicle, which formed the basis for his opinion on how
the separation caused the accident.  In
this case, the tire tread started peeling off progressively from one side and
as that occurred, it flapped around within the wheel well area.  This created a drag effect and pulling of the
vehicle to the left.  This occurrence
makes a very loud noise as the tread beats against various components of the
vehicle and interacts with the ground. 
Mr. Arndt has done actual vehicle testing of a sport utility vehicle
that showed the various effects of a tread separation on the handling
characteristic of a motor vehicle.  He
has also conducted tread failure simulation testing to evaluate how a vehicle
behaves as the tire tread is coming off the vehicle.  In this open loop testing, the driver was
instructed to hold the steering wheel straight in order to observe how the
vehicle responded.  In these tests, the
right rear tire was modified to fail by cutting in between the steel belts or
scoring the tire at an angle.  The
vehicle was instrumented and the data recorded was then analyzed.  Based on the empirical testing, Mr. Arndt
concluded that Aas the
tread comes off, the vehicle will pull to the side that the tread comes off.@ 
Next, Mr. Arndt ran a series of tests and then analyzed how the
vehicle would behave once the tread was gone. 
Mr. Arndt removed the outer steel belt to replicate the belt separation
in this case.  This testing showed that
the vehicle with one tire tread separated behaved completely different from the
vehicle with four good tires and showed oversteering characteristics and
quickly ended up spinning out.

According to Mr.
Arndt, if the driver did not steer the vehicle in this accident, he would have
gone off the left in the center median and perhaps had some other
accident.  Despite Mr. Mendez=s testimony that he never steered to
the right, Mr. Arndt believed he must have steered to the right because physics
did not support Mr. Mendez=s
recollection.  Likewise, physics did not
support Mr. Mendez=s
testimony that there was no pull to the left nor did it support Mr. Gonzales=s statement that the vehicle moved
immediately to the right, not to the left.

On appeal, Cooper
Tire argues that Mr. Arndt=s
opinions were unreliable because his testing was done with vehicles other than
a Mazda minivan.  At trial, Mr. Arndt
testified that the oversteering characteristics he observed in testing happened
across the spectrum of vehicles.  Mr. Arndt stated that with regard to
tread separation, a minivan is going to do the same thing and would be very
similar to the sport utility vehicle used in the testing.  

Cooper Tire also
asserts that his opinions lacked a reliable scientific or factual basis because
his opinion was contrary to witness testimony. 
Review of Mr. Arndt=s
testimony shows that he was aware of witness testimony and expressly disagreed
with their recollection of events.  Mr.
Arndt instead formed his opinions based on test data and physical evidence of
the scene and on the vehicle.  We
conclude that the trial court did not err in admitting Mr. Arndt=s testimony.

 








Curtis
Flynn=s
Testimony

Within Issue Six,
Cooper Tire also asserts that Curtis Flynn=s
opinion on how a vehicle reacts to a tread-belt separation was inadmissible
because he was not qualified to render the opinion and it amounted to
inadmissible speculation.  We disagree.

Curtis Flynn is a
former El Paso police officer.  After
graduating from the academy in 1975, he was assigned to the traffic division
and his primary function was motor vehicle accident investigation.  Mr. Flynn was later promoted to detective and
assigned to the criminalistics unit, followed by an assignment to the homicide
unit.  Since leaving the police department,
Mr. Flynn has been employed as an accident reconstructionist in the field of
motor vehicle accidents.  His
qualifications in accident investigation and accident reconstruction include
investigation of over 5,000 traffic accidents as a police officer and advanced
training in motor vehicle accident reconstruction.  Mr. Flynn was also an instructor with the El
Paso Police Department for the field advanced accidents investigation.

Mr. Flynn
explained that the function of an accident reconstructionist is to take data
and information collected in accident investigation and interpret that
information and physical evidence through analysis to determine facts such as
how fast vehicles were traveling, what direction they were traveling, and the
drivers= and
passengers=
actions.  In this case, Mr. Flynn
examined physical evidence at the accident scene, including gouge marks, tire
marks, and debris.  He also reviewed
witness statements, interviewed the investigating officer, read depositions of
the parties and witnesses involved in the accident, and saw the subject
tire.  








From his scaled
depiction of the physical evidence that remained at the accident scene, Mr.
Flynn determined that vehicle made a hard right-hand turn and as it did this,
the left rear tire started to mark the roadway and the vehicle started to slide
sideways while still moving forward.  At
some point, the vehicle was steered back to the left in an attempt to correct
the path of travel back on to the roadway. 
When the driver steered to the left, the right side tire marked the
roadway.  At that point, the rear end of
the vehicle was swinging out to the side and was in the beginning phase of the
roll over.  There were gouge marks in the
asphalt where the right front and rear wheels of the minivan began to trip or
flip into the air.  When the vehicle
progressed in the roll and continued to roll, it left identifiable marks in the
road surface.  In terms of his qualifications
to determine what caused the vehicle to roll in the manner it did, Mr. Flynn
stated that in his accident reconstruction training and experience, one of the
predominant aspects is the dynamics of a vehicle, that is, what happens to
vehicles during the course of an accident and what causes vehicles to act in
certain ways.








At trial, Cooper
Tire objected to Mr. Flynn=s
qualifications to render an opinion on how a vehicle reacts following a tread
belt separation.  Outside the jury=s presence, the trial court conducted a
Daubert hearing on this matter. 
In voir dire, Mr. Flynn testified that an integral part of accident
reconstruction is looking at the dynamics of the vehicle and how the tires
interact with the road and the vehicle itself. 
Mr. Flynn stated that he has been involved in various testing in which
they applied brake applications to individual wheels and found that if there
was a deceleration on that side of the vehicle at the left rear tire, the
vehicle will pull to the left.  This
testing was not specific to a tire blowout, but Mr. Flynn believed that the
deceleration was just achieved by different means in his testing.  In the jury=s
presence, Mr. Flynn testified that the physical evidence showed that the left
rear tire totally separated from the vehicle and this caused a deceleration at
the left rear portion of the vehicle.  He
stated that based on testing he has done, when this occurs, a vehicle will pull
to the left.

In its brief,
Cooper Tire points out that Mr. Flynn in voir dire could not recall the authors
of articles he reviewed, when the articles were published, or whether the
articles were 

peer-reviewed.  Cooper Tire also notes that Mr. Flynn
admitted he was not a tire failure analyst, that he did no studies to determine
the effects of a blowout versus a tire separation, and that his studies did not
involve tire disablements.  After
reviewing Mr. Flynn=s
testimony, it is clear that he had at least the minimum requisite
qualifications to render his opinion on deceleration.  His testimony on the matter was based on
testing, which he believed was applicable despite the different cause of the
deceleration in this particular case. 

We conclude the
trial court did not abuse its discretion in admitting Mr. Arndt=s testimony and Mr. Flynn=s testimony.  Accordingly, Issue Six is overruled.

EVIDENCE
OF OTHER LAWSUITS

In Issue Seven,
Cooper Tire contends the trial court erred in allowing the Plaintiffs to
introduce evidence of other incidents and lawsuits.  We review Cooper Tire=s
evidentiary challenge for an abuse of discretion.  See City of Brownsville v. Alvarado,
897 S.W.2d 750, 753 (Tex. 1995).

Cooper Tire
complains that over its objection, the Plaintiffs were permitted to elicit
testimony about other incidents and lawsuits from several defense
witnesses.  In response, the Plaintiffs
argue that the trial court properly admitted evidence of other lawsuits and
incidents for purposes of impeachment or to show bias.  We agree.








Rule 613(b)
permits impeachment of a witness by proof of circumstances or statements
showing his or her bias or interest.  See
Tex.R.Evid. 613(b).  In Russell v. Young, 452 S.W.2d 434
(Tex. 1970), the Texas Supreme Court recognized that under the well-established
law governing cross-examination, an expert witness may be cross-examined
regarding the number of times he has testified in lawsuits, payments for such
testifying, and related questions.  Russell,
452 S.W.2d at 436.

Here, Lyle
Campbell was questioned about his prior testifying experience.  Mr. Campbell identified the case as Tuckier,
but provided no details and did not mention the subject of the litigation.  Anthony Brinkman was asked if he participated
in the Tuckier trial and he replied no and provided no details on Tuckier or
any other lawsuit.  Cooper Tire=s expert Harold Herzlich was questioned
about other lawsuits, but no details were provided.  Jerry Leyden was questioned about testifying
for tire manufacturers, but no details were provided from those incidents.  Christopher Shapley was questioned about
other Cooper Tire lawsuits in which he was involved and whether he had given
similar testimony in an attempt to impeach Mr. Shapley=s
denial of a Alongstanding
relationship@ with
Cooper Tire.

The complained-of
questioning was clearly for impeachment purposes to show interest or bias in
the litigation.  Under Rule 613(b) such
questioning was permissible.  Therefore,
the trial court did not err in admitting this evidence.  Issue Seven is overruled.

IMPROPER
JURY ARGUMENT

In Issue Four,
Cooper Tire claims Plaintiffs=
counsel repeatedly engaged in improper jury argument, in which counsel accused
various witnesses of lying and appealed to the jury=s
ethnic and cultural heritage.  Cooper
Tire asserts that this argument was so prejudicial and inflammatory, it is
entitled to a new trial, thus the trial court erred in denying its motion for
new trial on this ground.








To obtain reversal
of a judgment on the basis of improper jury argument, Cooper Tire must
prove:  (1) an error; (2) that was not
invited or provoked; (3) that was preserved at trial by a proper objection,
motion to instruct or motion for mistrial; and (4) was not curable by an
instruction, a prompt withdrawal of the statement, or a reprimand by the trial
court.  Standard Fire Ins. Co. v.
Reese, 584 S.W.2d 835, 839-40 (Tex. 1979); see also Tex.R.Civ.P. 324.  

In this case,
Cooper Tire did not object to any of the Plaintiffs=
counsel=s
statements complained-of on appeal.  See
Tex.R.App.P..
33.1(a)(1).  However, an objection is not
required to preserve error if the error is deemed to be incurable.  Otis Elevator Co. v. Wood, 436 S.W.2d
324, 333 (Tex. 1968).  The test for
incurable error is Awhether
the argument, considered in its proper setting, was reasonably calculated to
cause such prejudice to the opposing litigant that a withdrawal by counsel or
an instruction by the court, or both, could not eliminate the probability that
it resulted in an improper verdict.@  Tex. Employers= Ins. Ass=n
v. Haywood, 153 Tex. 242, 266 S.W.2d 856, 858 (1954); see also Goswami
v. Thetford, 829 S.W.2d 317, 321 (Tex.App.--El Paso 1992, writ
denied).  Cooper Tire must prove that the
probability that the improper jury argument caused harm is greater than the
probability that the verdict was grounded upon the proceedings and the
evidence.  Tex. Employers= Ins. Ass=n
v. Guerrero, 800 S.W.2d 859, 865 (Tex.App.--San Antonio 1990, writ denied).








Cooper Tire
asserts that Plaintiffs=
counsel repeatedly accused Cooper Tire and its witnesses of fabricating
testimony and lying under oath.  Cooper
Tire directs our attention to numerous statements in the record, which after
reviewing the context in which they were made, we do not support Cooper Tire=s characterization.  These complained-of statements are as
follows:  (1) that Jean Hoffman did Atestify to things that may not be
technically accurate and might be false;@
(2) pointing out that Ms. Hoffman had not read articles that would have
contradicted her testimony; (3) asking why Ms. Hoffman testified about a false
possibility; (4) that Lyle Campbell Awas
not being truthful@ about
the existence or nonexistence of tapes of Cooper=s
manufacturing process; and (5) that Anthony Brinkman gave testimony that was Anot truthful.@  Cooper Tire did not object to these
statements, which appropriately can be regarded as challenges to the
credibility of defense witnesses, which were supported by the evidence.  None of these witnesses were condemned as
liars, as manufacturers of evidence, or as persons testifying purely out of
self-interest without regard for the truth, as Cooper Tire claims.

Cooper Tire also
complains of jury argument in which Plaintiffs=
counsel:  (1) claimed Cooper Tire Abought@
testimony from Deputy Sheriff Ventura Salas; (2) did not retain a certain tire
analyst because that analyst Awas
not for sale;@ and (3)
argued Cooper=s experts
Ahave decided to take not the path of
righteousness, but the path of the almighty dollar . . . .  They have become the merchants of doom; the
undertakers of Cooper Tire.  They will
bury anybody who stands in their way.@  Again, Cooper Tire did not object to these
statements, but on appeal asserts that these arguments accused both Cooper Tire
and its experts of perjury, manufacturing evidence, and disregarding the truth
in exchange for financial gain.  Cooper
Tire also argues that several of these comments were prejudicial and
inflammatory.  After careful review, we
find that these statements during Plaintiffs=
counsel=s
argument could have easily been cured by an objection and instruction to the
jury to disregard.








Cooper Tire also
contends the following statements constituted improper jury argument: (1)
accusing Cooper Tire of Ausing
[its employees] to sell positions to [the jury] that simply are not true;@ (2) stating that Cooper Tire employees
engaged in a Aconspiracy
of silence@ by
declining to testify because Aif
they were to speak, they would have to not be truthful.  If they went the other way, they=d be fired;@
(3) calling Cooper Tire=s
experts Aassassins
of truth;@ (4)
accusing Cooper Tire of Acreat[ing]
information@ and Asearch[ing] for the testimony from the
person who says what they want them to say;@
(5) telling the jury not Ato
believe Cooper Tire and their fabrications;@
and (6) stating that A[i]t=s equally obvious that Cooper Tire
doesn=t care
about the truth.@  While the above statements are troubling and
warrant scrutiny on appeal, we do not believe that these arguments were so
inflammatory, so harmful, or so prejudicial that an instruction to disregard
would not have eliminated the probability that an improper verdict would be
rendered.  Moreover, viewed in light of
the entire record, these arguments fail to establish that it was more probable
that their impropriety caused harm than it is probable that the jury=s verdict was based on proper
proceedings and evidence.

Finally, Cooper
Tire asserts that Plaintiffs=
counsel appealed to the jury=s
ethnicity and local prejudice.  First,
Cooper Tire complains of the following statement: 

[W]hen I heard you guys had menudo back
there, I did want to go back in there with you. 
And it made it worse when the Chihuahua posole was brought.  Now, that really made me jealous, because
there=s nothing
like being authentic and being real. 
That=s the
kind of cooking that we get here in El Paso; good home cooking, authentic and
real.

 

Cooper Tire did not object to
counsel=s comment
on the jurors=
breakfast.  Cooper Tire also commented on
the jurors having breakfast during its argument in this case.  We also note that the trial judge commented
on the jurors= menudo
during the course of this lengthy trial. 
After reviewing the record, we find that Plaintiffs= counsel did not pander to ethnic
unity, as Cooper Tire claims, nor was counsel asking the jury to decide the
case based on local prejudice or ethnic identity by his menudo comment.








Next, Cooper Tire
complains of the following two statements:

They have value--Cooper Tire has value,
but you know what? People here in El Paso have value, too.  What about us?  What kind of value do we have?  The kind that [defense counsel] says we have?
I submit to you, no.  We are worth just
as much as anybody else.

 

                                                              .               .               .

 

When this case is over with, the
Defendants and the people you see on this side, with only a couple of
exceptions, are going to be gone.  They=re never coming back to El Paso again.

But you know what?
Oskie is going to be here for the rest of his life--well, maybe not.  Maybe he=ll
move, but he=s going
to be an El Pasoan for his life.  Laura
is going to be an El Pasoan for her life. 
Danny is going to be an El Pasoan for his life.  They come in here with an attack on the
family . . . .

 

After reviewing the record, we find
that the above statements were invited and provoked by Cooper Tire=s counsel.  In closing argument, Cooper Tire=s counsel stated:

I find it incredible that these lawyers
over here, sitting there collectively as a group, would sit there and applaud a
man who gets in a vehicle and drives on a public highway under the influence of
cocaine.  It=s
not just the lawyers representing him. 
It=s these
folks here, too.  One of their theories
in this case is, in essence, cocaine is good. 
. . .  But they find it easier to
blame a company that is several states away . . . .

 

Cooper Tire also discussed the
effect of the jury=s verdict
for Cooper Tire employees, stating:

I think it=s
also appropriate to think about Tommy Engledowl, David Boone, Roger Moore, and
his son, Brian Moore, and how hard they work to feed their families because at
the end of this trial, Mr. Myers, Mr. Darnell and I will have to look them in
the eye and tell them about your verdict.

 








The complained-of jury arguments
were clearly invited and provoked by Cooper Tire=s
counsel=s
depiction of hard working families contrasted to its attack on the Plaintiffs= values.  Further, we find that the statements did not
ask the jury to decide the case based upon local prejudice or ethnic
unity.  Having reviewed all of Cooper
Tire=s
challenges to the Plaintiffs=
jury argument, we conclude that Cooper Tire has failed to show incurable jury
argument and therefore, overrule Issue Four.

JURY
MISCONDUCT

In Issue Five,
Cooper Tire contends that it was entitled to a new trial because of material
jury misconduct by which Cooper Tire asserts it was probably harmed.  In conjunction with this issue, Cooper Tire
also contends that the trial court erred in sustaining the Plaintiffs= objection to juror affidavits and
testimony concerning a juror who consulted a dictionary to define negligence, a
legal term in the trial court=s
charge.

We review the
trial court=s denial
of a motion for new trial based on jury misconduct for an abuse of
discretion.  Pharo v. Chambers County,
Texas, 922 S.W.2d 945, 948 (Tex. 1996). 
To obtain a new trial based on jury misconduct, it must be shown that
the misconduct occurred, it was material, and the misconduct probably caused
injury.  See Tex.R.Civ.P. 327(a); Golden Eagle
Archery, Inc. v. Jackson, 24 S.W.3d 362, 372 (Tex. 2000).

Under Rule 327(b)
of the Rules of Civil Procedure,

A juror may not
testify as to any matter or statement occurring during the course of the jury=s deliberations or to the effect of
anything upon his or any other juror=s
mind or emotions as influencing him to assent to or dissent from the verdict
concerning his mental processes in connection therewith, except that a juror
may testify whether any outside influence was improperly brought to bear upon
any juror.

 

Tex.R.Civ.P.
327(b); see also Tex.R.Evid.
606(b).

 








In Durbin v.
Dal-Briar Corp., this Court defined Aoutside
influence@ to mean
a force external to the jury and its deliberations.  Durbin v. Dal-Briar Corp., 871 S.W.2d
263, 272 (Tex.App.--El Paso 1994, writ denied). 
In Durbin, we stated that A[o]utside
influence does not include information acquired by a juror and communicated to
the others between the time the trial court instructs the jury and the time it
renders a verdict, even where the information is not in evidence, and is
unknown to jurors before trial.@  Durbin, 871 S.W.2d at 272.  Further, we noted that outside influence in
the form of information not in evidence must come from a non-juror.  Id. 
Recently, the Texas Supreme Court clarified that Rules 606(b) and 327(b)
prohibit considering the testimony about matters and statements occurring in
the course of the jury=s
formal deliberations.  Golden Eagle
Archery, Inc., 24 S.W.3d at 373-74. 
The Court maintained that the rules contemplate that an Aoutside influence@ originates from sources other than the
juror themselves.  Id. at 370; see
also Soliz v. Saenz, 779 S.W.2d 929, 932 (Tex.App.--Corpus Christi 1989,
writ denied)(information gathered by a juror does not amount to an outside
influence even if introduced to other jurors for the purpose of prejudicing
their votes).

According to
affidavits from several jurors offered by Cooper Tire, one of the jurors, Irma
Sagaribay, looked up the word Anegligence@ in her dictionary at home and the
following day brought this definition into the jury room and shared it with her
fellow jurors.  The jurors admitted that
the dictionary definition was used to avoid a mistrial and to render a
unanimous decision that Mr. Mendez was not negligent.

On appeal, Cooper
Tire argues that Ms. Sagaribay=s
conduct of improperly obtaining a dictionary definition of a legal term
otherwise defined in the charge occurred outside jury deliberations, therefore
the jurors=
testimony was not precluded.  Cooper
Tires also asserts that the jurors=
testimony did not reveal any aspect of jury deliberations and that the
definition was an improper outside influence. 
We disagree with Cooper Tire=s
contentions.

 








Ms. Sagaribay=s conduct of copying a dictionary
definition and sharing it with other jurors does not constitute an outside
influence.  While Cooper Tire
characterizes Ms. Sagaribay=s
act of copying the definition as occurring outside formal jury deliberations,
the alleged jury misconduct is in reality the act of sharing that definition
with other jurors and its consideration during the course of their
deliberations.  The proffered affidavits
clearly involved juror statements about matters occurring during their
deliberations, which is precluded under the rules.  We conclude the trial court did not err in
sustaining the Plaintiffs=
objection to the juror affidavits nor did the trial court err in denying Cooper
Tire=s motion
for new trial on this ground.  Issue Five
is overruled.

JURY
FINDING ON DRIVER NEGLIGENCE

In Issue Nine,
Cooper Tire challenges the jury=s
refusal to find causal negligence on the part of Oscar Mendez, Sr. and argues
that the finding is against the great weight and preponderance of the
evidence.  In its pleadings, Cooper Tire
alleged that Mr. Mendez was negligent and that his negligence proximately
caused his injuries and the injuries and deaths of the other occupants in the
minivan.[15]

Standard
of Review 








When a party
attacks the factual sufficiency of an adverse finding regarding an issue on
which it had the burden of proof at trial, it must demonstrate that the adverse
finding is against the great weight and preponderance of the evidence.  Dow Chem. Co. v. Francis, 46 S.W.3d
237, 242 (Tex. 2001)(per curiam).  In
reviewing a challenge that the jury=s
finding is against the great weight and preponderance of the evidence, we must
consider all the evidence, both the evidence which tends to prove the existence
of a vital fact as well as evidence which tends to disprove it.  Piatt v. Welch, 974 S.W.2d 786, 789
(Tex.App.--El Paso 1998, no pet.).  It is
for the jury to determine the weight to be given to the testimony presented and
to resolve any conflicts in the evidence.  Id. 
We cannot substitute our judgment for that of the jury, even if we would
find a fact contrary to that found by the jury, provided that the jury finding
is supported by the some probative evidence and is not against the great weight
and preponderance of the evidence.  Piatt,
974 S.W.2d at 789.  The jury=s verdict will be overturned only if it
is so contrary to the great weight and preponderance of the evidence as to be
manifestly unjust.  Id.

Evidence
of Driver Negligence

At trial, Mr.
Mendez described his recollection of the accident to the jury.  Mr. Mendez was driving along when he heard a
bang on the left side in the rear of the minivan.  As soon as he heard the big bang, the minivan
went to the right.  He thought he was
going to go off the road, so he turned the steering wheel Aa little bit@
to make it straight.  He recalled that he
did not apply the brakes and took his foot off the gas pedal.  Mr. Mendez could not remember what happened
at the scene after that.  According to
Mr. Mendez, he lost control when the tire Apopped.@








Mr. Mendez
admitted that on the preceding Friday, two nights before the accident, he split
a gram of cocaine with Manuel Duran at a bar. 
They were also drinking scotch. 
Mr. Mendez denied using cocaine or other drugs on Saturday, but
admitted to drinking four beers at his house on Saturday night while watching a
boxing match and another four at Mr. Duran=s
house.  Mr. Mendez denied using cocaine
or drinking alcohol on Sunday, the day of the accident.  He also denied seeing any beers in the van
before the tire failure and denied feeling depressed or fatigued that day.

Mr. Mendez
testified that he had previously owned a minivan and was familiar with how they
operate.  Over twenty years ago, Mr.
Mendez attended a thirteen-month course in auto mechanics and training on tire
service.  He knew that a nail could cause
a hole in a tire, could cause the low air pressure, and could cause damage to
the tire.  He also admitted that in 1982,
he attended a two-week driver=s
education course at the police department, in which he learned how to handle a
vehicle if it had a tire blowout or tread separation.  Mr. Mendez also learned not to apply the
brakes because this could cause loss of control and that one should hold on to
the steering wheel and guide the vehicle in a straight direction in such
circumstances.

Jose Gonzales, a
witness to the accident, testified that he observed the minivan and never saw
the brake lights applied.  Mr. Gonzales
assisted Mr. Mendez at the accident scene and was with him for forty-five
minutes to an hour.  Mr. Gonzales stated
that he was kneeling next to Mr. Mendez, about twelve inches from Mr.
Mendez= face,
and did not smell alcohol on his breath. 
Mr. Mendez=s pupils
appeared normal and nothing indicated that he was on any type of drug or
alcohol.








Police Officer
Eugene Nestor testified that he was dispatched to the accident and later went
to the hospital to draw Mr. Mendez=s
blood after being informed by another officer that at the scene he had detected
an odor of alcohol coming from Mr. Mendez. 
Officer Nestor did not detect the use of alcohol, but Mr. Mendez was
tested and the results showed zero for blood alcohol and a trace of cocaine,
less than .05 milligrams, in his system. 
Officer Nestor concluded in his investigation of the accident that the
driver had cut the steering wheel back and overcorrected.  He also believed that the weight of the
passengers contributed to the vehicle tripping and rolling.

Cooper Tire argues
that the jury=s refusal
to find Mr. Mendez negligent is against the great weight and preponderance,
pointing to evidence that a few hours after the accident, Mr. Mendez
tested positive for cocaethylene, a cocaine and alcohol derivative.  According to defense witness Rod McCutcheon,
Mr. Mendez=s cocaine
use was sufficient to affect his judgment and impair his driving skills.  There was also evidence that Mr. Mendez
overcorrected, even though he had learned what to do in the event of tire
failure.

After reviewing
all the evidence, we do not find that the jury=s
failure to find Mr. Mendez negligent was clearly against the great weight and
preponderance of the evidence.  Much of
the challenged evidence turned on witness credibility and the resolution of
conflicting evidence, matters within the jury=s
province.  We conclude that the jury=s finding is supported by some
probative evidence and is not against the great weight and preponderance of the
evidence.  Issue Nine is overruled.

JURY
FINDING ON DURAN=S
DAUGHTER

Melissa Snyder, in
her individual capacity, was awarded $902,506.85 in damages and interest based
on the wrongful death of Manuel Duran, as his alleged biological daughter.  Cooper Tire asserts that evidence to support
her status as Mr. Duran=s
daughter is both legally and factually insufficient.[16]

 








Sufficiency
of the Evidence

Melissa Snyder was
awarded damages pursuant to the Wrongful Death Act, the purpose of which is Ato provide a means whereby surviving
spouses, children, and parents can recover for the loss of a family member by
wrongful death.@  Garza v. Maverick Market, Inc., 768
S.W.2d 273, 275 (Tex. 1989); see Tex.Civ.Prac.&Rem.Code
Ann. '
71.004(a)(Vernon 1997).  In Garza,
the Court held that in a wrongful death action, an illegitimate child need not
be recognized in accordance with other bodies of law not specifically
applicable to the Wrongful Death Act.  Id.  However, if paternity is questioned, the
alleged child must prove by clear and convincing evidence that he or she is a
filial descendent of the deceased.  Id.
at 275-76.  

In considering a Ano evidence@
legal sufficiency challenge in a clear and convincing question in a wrongful
death action, we consider all of the evidence in the light most favorable to
the plaintiff, disregarding all contrary evidence and inferences to determine
whether some or all of the evidence rises to the level of clear and convincing
evidence in a particular case.  See
Garza, 768 S.W.2d at 276; In re J.F.C., 96 S.W.3d 256, 268 (Tex.
2002)(distinguishing the legal sufficiency standard of review of a federal
constitutionally mandated clear and convincing evidence burden of proof from
that imposed in Garza).  As to
what evidence is clear and convincing, the Garza Court stated that Aa fact finder must decide that question
in each case.@  Garza, 768 S.W.2d at 276.  Blood tests, if available, may help to show the
alleged father=s
paternity.  Id.  Evidence of physical resemblance of the child
to the alleged father is also admissible to determine paternity.  Id. 
In addition, the alleged father=s
admissions bearing on his relationship to the child and evidence of periods of
conception and gestation may be considered. 
Id.








In our factual
sufficiency review, we consider all of the evidence in the record, including
any evidence contrary to the judgment.  Plas-Tex,
Inc. v. U.S. Steel Corp., 772 S.W.2d 442, 445 (Tex. 1989).  In In re C.H., the Texas Supreme Court
held that the appellate standard for reviewing factual sufficiency in
termination findings is Awhether
the evidence is such that a factfinder could reasonably form a firm belief or
conviction about the truth of the State=s
allegations.@  In re C.H., 89 S.W.3d 17, 25 (Tex.
2002).  In re C.H. clearly applies
in parental terminations case where the clear and convincing evidence standard
serves to protect due process interests. 
See In re C.H., 89 S.W.2d at 25; see also Santosky v. Kramer,
455 U.S. 745, 769, 102 S.Ct. 1388, 1403, 71 L.Ed.2d 599 (1982).  

Unlike in In re
J.F.C., the Court in In re C.H., made no distinction between the Aclear and convincing standard@ in the context of wrongful death
actions.  See In re J.F.C., 96
S.W.3d at 268.  Rather, the In re C.H.
Court stated that the traditional factual sufficiency standard, in which a
court determines if a finding is so against the great weight and preponderance
of the evidence that it is manifestly unjust, shocks the conscience, or clearly
demonstrates bias, Ais
inadequate when evidence is more than a preponderance (more likely than not)
but is not clear and convincing.@  In re C.H., 89 S.W.3d at 25.  Further, the Court stated that [a]s a matter
of logic, a finding that must be based on clear and convincing evidence cannot
be viewed on appeal the same as one that may be sustained on a mere
preponderance.@  Id. 
In light of the Court=s
clear directive in In re C.H., we will apply the heightened standard of
review to Cooper Tire=s
factual sufficiency challenge.  Cooper
Tire concedes that if the evidence is such that a reasonable jury could form a
firm belief or conviction as to the truth of Melissa Snyder=s allegations, then the evidence is factually
sufficient.  See In re C.H., 89
S.W.3d at 25.








In the instant
case, Melissa Snyder testified that Manuel Duran was her father.  Ms. Snyder stated that Mr. Duran was
involved in her life and attended her school activities.  However, when Ms. Snyder was born in 1975,
her mother, Guillermina Bonar, was married to Ron Snyder.  Melissa=s
birth certificate names Mr. Snyder as her father.  Melissa=s
mother and Mr. Snyder were not living together at the time of her birth, but
Mr. Snyder did visit nine months before, to celebrate an anniversary.  The 1977 Utah divorce decree dissolving the
marriage between Guillermina Bonar and Mr. Snyder named Mr. Snyder as Melissa=s father and ordered him to pay child
support.  Melissa testified that Mr.
Snyder recognized that he was her stepfather. 
Photographs were admitted into evidence that showed Melissa with Mr.
Duran and family members involved in family activities.  These photographs were also offered to show a
physical resemblance between Melissa and Manuel Duran.  Melissa also testified about the probate
court=s
determination of her status to Manuel Duran=s
estate and the probate court=s
order was admitted into evidence.

Guillermina Bonar
testified that Manuel Duran was Melissa=s
father.  Melissa=s
mother stated that Manuel Duran was the only person she was having sexual
relations with during the time of Melissa=s
conception.  Ms. Bonar denied the
accuracy of the divorce decree and stated she was unaware of the divorce
hearing and was not present when the decree was issued.  Kevin Duran testified that Melissa was his
full sister and was the daughter of Manuel Duran.  Oscar Mendez testified that Melissa was
Manuel Duran=s
daughter and that he was unaware of her having the last name of Snyder.








After viewing the
evidence in a light favorable to the jury=s
finding, we conclude there is clear and convincing evidence that Melissa was
the biological daughter of Manuel Duran for purposes of recovery under the
Wrongful Death Act.[17]  Further, after viewing all the evidence, we
conclude there was evidence such that the jury could form a firm belief or
conviction as to the truth of Melissa=s
allegations.  While Melissa=s birth certificate and the Utah
divorce decree named Mr. Snyder as Melissa=s
father, there was overwhelming evidence from which the jury could infer Melissa
was the biological child of Manuel Duran. 
Issue Ten is overruled.

Having overruled
all of Cooper Tire=s issues
on appeal, we affirm the trial court=s
judgment.

 

 

October
14, 2004

DAVID WELLINGTON
CHEW, Justice

 

Before Panel No. 1

Larsen, McClure, and Chew, JJ.











[1]
Cooper Tire argued that the pattern jury charge submission for manufacturing
defect is incomplete because it does not differentiate for the jury between a
manufacturing defect and other types of defect, such as design defect and
marketing defect.  Its primary contention
was that the submitted definition did not require the jury to find that the
product in question had a flaw, that is, a manufacturing defect.





[2]
Cooper Tire requested the following instruction:  AA
>manufacturing defect= exists when a product does not conform
to the design standards and blueprints of the manufacturer.@





[3]
According to Mr. Grogan=s
deposition testimony, admitted into evidence for the pretrial Daubert
hearing, he worked from 1947 to 1956 as a junior technical assistant and
technical assistant compounder, preparing chemical formulas for tire
components.





[4]
Mr. Grogan explained in deposition testimony that he worked his way up through
the ranks of the tire exam lab.  In that
lab, Dunlop employees examined new tires manufactured by the company and by its
competitors.  From 1956 to 1964, Mr.
Grogan worked on steel-belted radial tires, which Dunlop was developing.





[5]
Mr. Grogan explained in deposition testimony that in 1964, he worked in the
tire performance department as coordinator of tire examination services.  In that department, employees analyzed
statistical data from returned tires to predict the adequacy or weakness of any
particular design and based on their analyses suggested design changes.





[6]
Mr. Grogan took over the tire exam lab, but retained the x-ray section, the
technical service section, and the cure section, a section of the tire exam lab
where employees conducted cure analysis for various products.  In the tire exam lab, the adhesive qualities
of various rubber components in the finished product were checked.  He also managed part of the test house
examination section, where new tires were tested to ultimate failure for
quality assurance.





[7]
In his deposition, Mr. Grogan stated that two tire examiners, David Price and
John Manderson, each reviewed his book in the Institute of Traffic Accident
Investigators and the Journal of The Forensic Science Society, respectively.  Mr. Price and Mr. Manderson are forensic
scientists, whom Mr. Grogan trained while he worked at Dunlop.  They also reviewed Mr. Grogan=s second book as did Phil Sacks.





[8]
Mr. Grogan also similarly described his examination procedure in deposition
testimony.





[9]
Jean Hoffman, Cooper Tire=s
chief chemist in the Texarkana plant where the tire was manufactured in 1994,
testified that microcrystalline or paraffinic waxes are used at the plant and
serve as an antioxidant/antiozonant in the compounds.  Ms. Hoffman stated that their purpose is to
migrate through the compound and to protect the tire from the elements and to
prevent the rubber from cracking that may occur due to oxidation or ozone.  She agreed that they add a blend of
microcrystalline and paraffinic waxes to the tread compound and the sidewall
compound.  In 1994, the Texarkana plant
did not add those antiozonants to the skim stock compound.  Ms. Hoffman stated, however, that these
waxes are a constituent of compounds that contain a processing oil that help in
the mixing and milling operation.  Once
the components are put together in the tire, those materials migrate and get
into other compounds.  It was no surprise
to Ms. Hoffman that the RAPRA report found wax on the belt/skim compound because,
contrary to Mr. Grogan, she believed it would be very common for the wax to
migrate from the tread or the sidewall into the belt/skim compound.





[10]
With respect to the tread itself, Dr. Milner observed that the outer belt
separated from the inner belt and in one area the outer belt was partially
detached from the underside of the tread, making the inner side and outer side
of the outer belt observable for inspection. 
Dr. Milner microscopically examined both sides.





[11]
Upon inspection with a microscope, Dr. Milner determined that the penetrating
object came from the outside inwards, with the innermost part showing rust on
the brassy wires caused by the environment. 
The underside of the outer belt, however, showed no rust.  Based on his observations, Dr. Milner
concluded that the punctured object was well-sealed, because if it had not
been, outside moisture would have caused the broken wire to rust.  





[12]
Cooper Tire also made a bill of exceptions during Mr. Mendez=s testimony.  Mr. Mendez testified that he only put on
his seat belt while driving because there were police on the highway.  Mr. Mendez was aware that the other
passengers were not wearing their seat belts.





[13]
We observe that Cooper Tire suggests in its brief that Section 545.413(g)
violates its due process rights under the federal and Texas constitutions,
however, Cooper Tire provides no argument in support of this contention.  We find that Cooper Tire has failed to
adequately brief this issue and we do not reach its purported constitutional
challenge in this opinion.  See Tex.R.App.P. 38.1 (h).





[14]
Mr. Arndt could not determine the degree of steer back to the left, but
believed it was not a large steer, that is, forty-five degrees or more because
that would have led to the vehicle spinning out.





[15]
The jury answered no to the following:  ADid the negligence, if any, of Oscar
Mendez, Sr. proximately cause his injuries and the injuries to Maria Luisa
Mendez, Adela Duran and Manuel Duran?@





[16]
By its tenth issue, Cooper Tire is challenging the jury=s
finding that there was clear and convincing evidence that Melissa Denise Snyder
is the biological daughter of Manuel Duran. 
The jury was instructed that Aclear
and convincing evidence@
means the measure or degree of proof that produces a firm belief or conviction
of the truth of the allegations sought to be established.





[17]
We also note that we would have reached the same conclusion under the
sufficiency review standard announced in In re J.F.C.  See In re J.F.C., 96 S.W.3d at 266.